From Wm. F. Schutte, Beaver, Pa.

---

## Miehle's Case.

*Contempt of court—Communications to grand jury.*

1. No one can communicate with the grand jury, or any of its members, in relation to matters which are, or may be, proper for their inquiry, either on questions of law or fact.

2. The grand jury are officers of the court under its legal direction, receive their instructions from it only, and are entitled to the protection of the court from all attempts to control, influence or bias them.

3. Attempts to influence the grand jury are criminal in the eye of the law, a contempt of court and an obstruction to the administration of justice.

4. Communications to the grand jury irregularly made are not excusable, because of a misguided zeal in the supposed furtherance of the public good.

Proceedings for contempt of court. Q. S. Schuylkill Co., Misc. Docket, No. 343.

*A. L. Shay* and *M. A. Kilker, amicus curiæ.*

*M. M. Burke* and *J. L. N. Channell,* for respondent.

BERGER, J., Dec. 31, 1927.—At the January Sessions of our Court of Quarter Sessions, the grand jury was directed to return for a sitting during the second week of the term and were charged by Bechtel, P. J., to investigate and report relative to matters pertaining to petitions filed for registration in the first precinct of the Second Ward of the City of Pottsville for the primary election held on May 18, 1926, and also respecting the loss of a petition for the registration of one Howard Butz, in the same precinct, which had been produced in a hearing pertaining to registrations before Koch, J., and which either disappeared or was lost after the hearing. The grand jury found no fraud or criminality, either in connection with the petitions for registration or in the disappearance or loss of the petition for the registration of Howard Butz, and reported Jan. 12, 1927, through its foreman, C. E. Knopp, *inter alia,* as follows: "In the course of this investigation pending before the Grand Jury, a letter was received by the foreman of the Grand Jury, Rev. C. E. Knapp (Knopp), signed 'Edith Miehle.' The foreman produced this letter and the Grand Jury fully and completely exonerates the foreman, Rev. C. E.

### Miehle's Case.

Knapp (Knopp) from any suspicion or collusion between him and Miss Miehle in his action or conduct as a member of this Grand Jury. We submit herewith a copy of the letter received by the Rev. C. E. Knapp (Knopp) to your Honorable Court as a part of this report. Respectfully submitted. C. E. Knopp, Foreman."

The letter attached to the report reads as follows:

"My dear Rev. Knopp: This morning I met several people who know something of the Second Ward affair.

"Mrs. Conrad Foley & Miss Helen Foley—wife & daughter of Conrad Foley—who is one sued by Cy Palmer—libel suit. They will both tell the truth if permitted to do so, by proper questions put to them. The O'Connors, 429 E. Norwegian St lived there 2 weeks—and signed some paper to this effect. When paper was seen again, weeks had been erased and months substituted. These people had a story framed up for any investigator—but the son of Conrad Foley, since this registration has married a daughter of O'Connor—and he had made them see their duty.

"The Foleys and Conrads have been subpœnaed. Will freely and honestly answer questions.

"A Miss Lewis, home Atlantic City, visiting at the time at relatives' home. John W. Noble, who now lives 400 E. Adams Street. She registered through Mrs. Ira Hasler, 508 Fairview Street—Phone 1114W. Mrs. H. is sister-in-law of John Noble.

"Wm. D. Williams 403 E. Adams St. a brother-in-law of Noble—as well as Noble is perfectly willing to help by telling all they know—would welcome the opportunity.

"May be able to find some more citizens able and willing to shed light on the situation. Several people tell me, and I believe it to be true that the Snyder faction, Florence Hamilton acting under their orders, have done as much and even worse in other campaigns. They are pushing this because they have caught the Houck-Lieb faction. Who, We, who are interested hope that citizens, independent of either faction will bring out the truth to be made a matter of record. This case will have influence on the whole County.

"Sincerely yours,

"EDITH MIEHLE."

Thereupon the court, upon its own motion, by a preamble reciting the facts and an order made Jan. 17, 1927, which were served upon the respondent, Edith Miehle, directed a rule to issue against her, returnable Jan. 31, 1927, to show cause why she should not be adjudged guilty of contempt. She made answer to this rule Jan. 31, 1927, saying, in part, as follows: "I did not intend, in writing said letter, to cast any reflection whatever on the dignity of the court, nor does said letter, so far as I am able to see, tend in any respect to do so. I disclaim and deny that said letter is in any way contemptuous, but since the Court has so adjudged it, I respectfully apologize to the Court for writing it. I regarded as highly proper the action of the Court in referring the matter to the Grand Jury for investigation. As a citizen of the County, I welcomed this action, and it was my hope and purpose in writing the letter that I might be able to assist the proceeding and certainly not to embarrass the administration of justice. . . . That the letter in question was written in response to a request by Rev. C. E. Knopp, foreman of the Grand Jury, that I give him the names of witnesses who might be able to give evidence bearing on the matters before the Grand Jury for investigation. I had previously informed him that I knew of some such witnesses, and asked if I should submit them. I have been secretary of the Schuylkill County Law

### Miehle's Case.

Enforcement League since its organization some years ago and Rev. Knopp has been a member thereof for some years. I felt that I could properly, in furtherance of the work of said league, submit to Rev. Knopp the names of important witnesses who could offer valuable testimony in substantiation of the charges referred by the Court to the Grand Jury for investigation. I sought in this way to lay before the Grand Jury only that which would disclose the truth and further the ends of justice and add to the dignity and strength of the Court." Subsequently, or on March 14, 1927, the respondent filed a petition, praying (1) for leave to file a substituted answer, withdrawing the language in the original answer, imputing to the court, inadvertently, perhaps, a prejudgment of her cause; and (2) for an order striking the original answer off. This petition was directed to be filed, but no further order on it has been made.

At the hearing upon the rule to show cause, it developed that Rev. Knopp had received a letter from Miss Miehle, the respondent, on Saturday, Jan. 8, 1927, in which she volunteered to give him information relative to the proposed investigation. Pursuant thereto, he called her on the phone at the home of Mr. Channell, her brother-in-law and one of her present counsel, and arranged to meet her on Monday morning, Jan. 10, 1927, at the public library in Pottsville, before the court convened. At that meeting she gave him the names of three persons, Lydia Jackson, Mrs. Alexander and A. Huntzinger, whom he called before the grand jury. The purpose of this meeting was developed by the cross-examination of Miss Miehle, which, in part, is as follows:

"Q. Did you talk to the foreman of the grand jury in reference to the merits of the question that was under investigation? A. The only conversation I had was Monday morning. Q. What did you say to the foreman of the grand jury with reference to the merits of the question that was under investigation on Monday morning? . . . A. I was speaking to him as one member of an organization to another, which is organized to help better conditions in this county."

By Mr. Burke: "Q. What did you say? A. I told him, as far as I recall, that we in the Second Ward were greatly interested in it and I did hope that the affair would be cleared up and it would stop this bad feeling that existed in that ward; and that it was only through questioning as many citizens as possible that it would be brought out, citizens on both sides. That is about the gist of what I told him, I think, as far as I recall; and, as I stated in the letter, I tried to find some more names Monday morning, and it was agreed that he should call me up on Monday afternoon before he left town and I would let him know what I had. Monday morning before noon, before I went up home, I wrote this letter and left it at the library so that I could send him for it Monday afternoon after he was through here."

By Mr. Kilker: "Q. Did you not tell him that criminal practices were being indulged in by the political factions in that ward and that you would supply witnesses who would make proof of that fact? A. I told him that was what the charges were and the people were saying if they got a chance to get up there they would tell what was going on. Personally, I knew nothing; it was what these people said they would tell. I did not really know what they would tell, but they said they would if they would get a chance to tell. Q. Did you personally talk to those people whose names you furnished to Rev. Knopp in the letter? A. No, not in the letter."

By Judge Berger: "Q. Did you to the other three? A. Only two. Q. To the other two? A. Yes. Q. The first two you gave him you had spoken to personally? A. Yes. Q. The others you had not? (Not answered.)"

As the outcome of the meeting at the public library, the letter hereinabove quoted was written. The question for determination, therefore, is whether these acts of Miss Miehle constitute a contempt of court. Individuals have no right to be heard by grand jurors unless they appear before them in response to a subpœna issued by the court, for the grand jury is without power to compel the appearance of a witness. No one has any right to send letters to members of the grand jury relative to subjects which are or may come before them. No one can communicate with the grand jury, or any of its members, in relation to matters which are or may be proper for their inquiry, either on questions of law or fact. The grand jury are officers of the court under its legal direction, receive their instructions from it only, and are entitled to its protection from all attempts to control, influence or bias them. Attempts of this kind to influence the jury are criminal in the eye of the law, a contempt of court and an obstruction of the administration of justice: Com. v. Crans, 2 Clark, 172.

Criminal proceedings in Pennsylvania are divided, in respect of their origin, into ordinary and extraordinary. The first consist of those regularly instituted by a warrant of arrest founded upon an information in writing, supported by oath or affirmation, lodged with the proper officer. The second are those which are commenced (1) by direction of the court to the grand jury to investigate matters of so grave and general public import as to justify such intervention; (2) by the preferment of an indictment to the grand jury by the district attorney, with leave of the court; and (3) by presentment of a grand jury: Case of Lloyd and Carpenter, 3 Clark, 188. The duties of the grand jury, irrespective of the manner in which proceedings are brought before them, having indictment of a person or persons for the end, are essentially alike in all cases and are fully defined in the oath administered to them: Com. v. Dietrich, 7 Pa. Superior Ct. 515, 520. We make mention of this only because the respondent freely admitted that she knew that it was unlawful to communicate with the grand jury during the first week of its sitting while passing on bills of indictment regularly submitted to it, but both she and her counsel seem to labor under the erroneous impression that because its proceedings of the second week were of an extraordinary nature, it somehow became her duty to try to assist and influence the grand jury in its deliberations. This is dangerous doctrine, but not so uncommon as it may at first seem to be, for assaults on the administration of justice are often made under pretext of its vindication, or, as may be the case here, by a misguided zeal in the supposed furtherance of the public good. One who attempts to influence or prejudice a juror—grand, petit or traverse—in the discharge of his duty incurs a threefold liability, namely, (1) summary punishment by the court; (2) indictment for contempt or embracery; and (3) by an action for damages. Our duty in the instant case is clear and well defined in the words of Yerkes, P. J., in Doan's Case, 5 Dist. R. 211, 213, as follows: "It has been held to be the duty of the judge to enforce the proceedings (contempt) either by summary punishment or by binding the offender over to answer an indictment, even where the misbehavior is toward himself, and though personally he should be disposed to ignore it, for, said Holroyd, J., in Rex v. Davison, 4 B. & Ald. 329: 'It is not on his own account that he commits; that is a consideration which should never enter his mind. But though he may despise the insult, it is a duty which he owes to the station to which he belongs not to suffer those things to pass which will make him despicable in the eyes of others. It is his duty to support the dignity of his station and uphold the law so that, in his presence at least, it shall not be infringed.'"

Miehle's Case.

We have been impelled to discharge like duties in the cases against John Connor (apparently not reported), Joulwan's Case, 2 D. & C. 188, and Guarantee Trust and Safe Deposit Co. *v.* Heidenreich et al., 5 D. & C. 184, 186.

This opinion is filed pursuant to the reservation made in the order handed down Dec. 19, 1927, adjudging Miss Miehle guilty of contempt of court.